UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES,<br><br>          Plaintiff,<br><br>     v.<br><br>THOMAS LAYMAN BINFORD,<br><br>          Defendant. | No.  1:20-cr-00150-ADA-BAM-1<br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS, MOTION TO QUASH, AND REQUEST FOR EVIDENTIARY HEARING<br><br>(ECF No. 54) |

This matter is before the Court on Defendant Thomas Layman Binford's motion to suppress, motion to quash, and request for evidentiary hearing.  (ECF No. 54.)  On April 10, 2023, the Court held a hearing on the motion.  (ECF No. 57.)  After a consideration of the moving papers and the arguments of the parties, the Court will deny Defendant's motion.

## BACKGROUND

### A.  Procedural History

On August 19, 2020, the government charged Defendant with one count of "Receipt and Distribution of Child Pornography" in violation of 18 U.S.C. § 2252(a)(2), and one count of an "Attempted Online Enticement and Coercion of a Minor to Engage in Illegal Sex Act[s]" in violation of 18 U.S.C. § 2422(b).  (ECF No. 1 at 1.)  In 2001, the Court convicted Defendant for "Lewd or Lascivious Acts with a Child under 14" in violation of California Penal Code § 288(A).  (*Id*. at 12.)  In 2010, the Court convicted Defendant for "Failure to Register as a Sex Offender" in

1   violation of California Penal Code § 290.  (*Id*.)

2        On August 27, 2020, a United States Magistrate Judge ordered Defendant to be detained.

3   (ECF Nos. 6, 7.)  A Grand Jury indicted Defendant on September 3, 2020.  (ECF No. 12.)  The

4   Court issued a Minute Order scheduling a status conference for October 28, 2020.  (ECF No. 18.)

5   However, the parties continuously stipulated to continue the status conference.  (ECF Nos. 19–47.)

6   On September 6, 2022, the parties stipulated to begin trial on January 31, 2023, but later set a

7   Change of Plea hearing, requesting the January 31, 2023, trial be vacated.  (ECF Nos. 49–51.)  On

8   February 2, 2023, the parties stipulated to vacate the Change of Plea hearing and set a Motion to

9   Suppress hearing for April 10, 2023.  (ECF Nos. 52, 53.)  Defendant filed this motion on February

10  27, 2023.  (ECF No. 54.)  The government opposed on March 20, 2023.  (ECF No. 55.)  Defendant

11  replied on March 27, 2023.  (ECF No. 56.)

12  **B.  Facts**

13       On July 24, 2020, Special Agent Monique Jacques ("SA Jacques" or "the undercover

14  agent") was conducting an undercover online investigation of the social media platform "Skout"

15  from the Fresno Homeland Security Investigations (HSI) office.  (ECF No. 1 at 4.)  SA Jacques

16  posed as a 13-year-old girl on the Skout platform under the pseudonym "Morgan B."  (*Id*. at 4–5.)

17  "Morgan B." received a message on Skout from "Teachyou559," later identified as Defendant,

18  Thomas Binford.  (*Id*. at 5.)  Between July 24, 2020, and July 28, 2020, approximately 3,314 text

19  messages were sent between "Morgan B." and Defendant, along with 90 Skout messages.  (*Id*.)

20  Defendant disregarded "Morgan B." when she stated that she was "young," and Defendant told her

21  not to tell him her age.  (*Id*.)  Defendant continued to message "Morgan B." after she told him she

22  was 13 years old, and Defendant told her to message him using a "texting app" for "privacy,"

23  providing "Morgan B." with his Virtual Over Internet Protocol (VOIP) number.  (*Id*.)  Defendant

24  told "Morgan B." to save his number in her phone as "Janet" and to delete all messages from him

25  "so that neither of [them] would get into trouble."  (*Id*.)  Over the next five days, Defendant

26  proceeded to send "Morgan B.," whom he thought was a 13-year-old girl, pornographic and explicit

27  sexual messages and images, engaged in grooming activity, and sought information of where

28  "Morgan B." lived and when "Morgan B." would be alone at home.  (*Id*.)

"Morgan B." told Defendant she lived somewhere near the Costco on Shaw Avenue but did not disclose a location to meet, and Defendant drove to the WinCo on W. Shaw Avenue and sent "Morgan B." a picture of the location, requesting further information to get to her.  (ECF No. 1 at 5–6.)  When "Morgan B." told Defendant she was scared, he began to get angry with her.  (*Id*. at 6.)  On July 28, 2020, Defendant requested "Morgan B.'s" location, sending more explicit images and messages.  (*Id*.)  "Morgan B." then later provided a meeting location at a park near Barcus and State Avenues in Fresno.  (*Id*.)  The address was 5140 N State Ave.  (*Id*.)

Defendant provided constant updates as he was driving and advised when he arrived and stated he was in a red car.  (ECF No. 1 at 7.)  Surveillance on scene observed a subject driving a red Honda Civic that parked on State Avenue, near the park.  (*Id*.)  In her affidavit supporting the criminal complaint, SA Jacques wrote "[d]uring police initial contact with [Defendant], his phone was on next to him[,] and he had the VOIP messaging application 'Pinger' up with his number, messaging my cell phone."  (*Id*.)  During that initial contact, Defendant was positively identified with his California Driver License.  (*Id*.)

Officer John Guzman responded to conduct the vehicle stop.  Officer Guzman reported the investigative stop on a "Use of Force" report, with the following details:

> At approximately [9:50p.m.], Fresno County Sheriff's Office (FSO) [Internet Crimes Against Children] ICAC Commander Lt. B. Pursell, requested that [Multi-Agency Gang Enforcement Consortium] MAGEC assist with the apprehension of a subject who had arranged a meeting with an undercover agent posing as a child.  The subject, who was identified as [Defendant], was confirmed to be a [sex-offender] registrant with prior convictions for sex crimes against children.  Based on information obtained by ICAC investigators, [Defendant] was travelling to the area of State Street and Barcus Avenue, in the City of Fresno.  It was near this intersection that [Defendant] had arranged to meet with what he believed to be a juvenile subject [citation].  At the request of ICAC detectives, MAGEC Tac[tical] members were also tasked with preventing any attempts by [Defendant] to destroy evidence prior to and during his apprehension.  This evidence included cell phones, tablets, computers, and any other electronics which could be used for communication purposes.

> After receiving this information from Lt. Pursell, myself and assisting MAGEC detective[s] immediately responded to the area of Shaw and Barcus Avenues, arriving at approximately [10:20p.m.].  At this point, assisting MAGEC detectives and I established communication with HSI Agents who were already actively conducting surveillance in the area where [Defendant] had arranged to meet the juvenile.

In an effort to protect the integrity of the active investigation, ICAC detectives requested that MAGEC remain on standby in the area until [Defendant] travelled to the designated location in his vehicle. HSI Agents would remain on active surveillance and direct MAGEC detectives to [Defendant]'s location once he arrived.

At approximately, [10:59p.m.], [Defendant] arrived at the intersection of Barcus Avenue and State Street, in a red 2009 Honda Civic ([license plate number]). Upon his arrival in the area, Lt. Pursell gave the directive for MAGEC Units to move in and take [Defendant] into custody. With the assistance of HSI surveillance units, I located the Honda at approximately [11:00pm] on State Street, just north of Barcus Avenue, in the City of Fresno. Immediately after locating the Honda, I proceeded with initiating an investigative vehicle stop near [the] above listed intersection.

To conduct this stop, I activated my patrol vehicle's overhead emergency lighting equipment (solid forward facing red light with flashing LED red and blue lights) so as to indicate to the driver he was being lawfully stopped. [Defendant] was well within view of my patrol vehicle as I positioned myself head on with the Honda so as to prevent any attempt by the suspect to flee. This positioning also allowed me to see directly into the Honda and positively identify [Defendant] as the sole occupant.

At this point, I immediately exited my patrol vehicle and walked to the driver side door of the Honda. Once at this position, I gave [Defendant] multiple verbal commands to put his hands up above his head and directed him not to reach for anything in the vehicle. Despite these clear and audible directives, [Defendant] failed to comply and proceeded to reach for a cell phone which was laying in the front passenger seat. After taking possession of the cell phone in his right hand, it became apparent that [Defendant] may have been making an attempt to destroy possible evidence related to ICAC's investigation.

[…]

In an effort to prevent [Defendant] from destroying evidence or reaching for a possible weapon, I proceeded to open the driver side door of the Honda so as to allow my entry into the vehicle. Once the door was open, I reached across [Defendant]'s body and used my right hand to grab hold of his right forearm. Using my grasp of his forearm to prevent any additional movement, I proceeded to use my left hand to grab hold of the cell phone and force it out of his right hand. This action was successful in removing the cell phone from [Defendant]'s possession and causing it to fall back onto the front passenger seat of the Honda. After ensuring the cell phone was no longer in his possession, I immediately transitioned my efforts to removing [Defendant] from the vehicle so he could be successfully arrested pursuant to [Cal. Pen. Code § 288]. It was at this point in the incident that MAGEC Detective R. Pulkownik arrived at my side and assisted with my efforts to remove [Defendant] from the vehicle [see Pulkownik's Use of Force report].

[…]

At the conclusion of my investigation at the scene, I proceeded to transport [Defendant] to [Fresno Police Department (FPD)] to be interviewed by ICAC detectives. At approximately

4

[11:52 p.m.], I arrived to [FPD] and turned over custody of [Defendant and his cell phone] to ICAC Detectives.

(ECF No. 54-4 at 2–4.)

Defendant was transported to the interview room at the FPD.  (ECF No. 1 at 7.)  Defendant, after being read his Miranda rights, refused to speak further without a lawyer present.  (*Id*. at 7–8.) Defendant's cellphone was provided to forensic examiner Detective Kenneth Kalar, who requested a search warrant of the phone on July 29, 2020.  (*Id*. at 8.)  In his affidavit requesting that search warrant, Detective Kalar explained his credentials, including that he has been an officer in Fresno since 2003, and has investigated child exploitation since 2016.  (ECF No 54-2 at 6–7.)  Detective Kalar also stated the following:

> "Teachyou559" provided constant updates as he was driving and advised when he arrived and stated he was in a red car.
>
> Surveillance on scene observed a subject driving a red Honda Civic that parked on State Ave[nue] near the park.  The person was contacted and was positively identified as . . . [Defendant] . . . a registered sex offender . . . During police initial contact with [Defendant], his phone was on next to him[,] and he had the VOIP messaging application "Pinger" up with his VOIP number, messaging [SA] Jacques.  At the time of his arrest, [Defendant] had in his possession a red and white Apple [i]Phone 8 [P]lus.
>
> I believe that a forensic examination of the cellular telephone . . . will reveal the instrumentalities and fruits of the crime of PC 288.4(b).  Additionally, based on my training and experience, I know that it is not uncommon for a suspect to chat with multiple people while attempting to meet for the purposes of sexual activity.  A forensic examination could reveal other child victims.
>
> I request that this search warrant be issued, based on the above facts for the seizure of said electronic data or any part therein.

(ECF No. 54-2 at 9.)

Following the issuance of that warrant, Detective Kalar conducted computer forensics of Defendant's iPhone and found two images of child pornography.  (ECF No. 1 at 8.)  Detective Kalar requested a second warrant on July 30, 2020, to search and seize Defendant's iPhone for evidence of child pornography (*id*.), where he stated:

5

Child pornographic images tend to be extremely important to these offenders[; thus,] it is unlikely an offender will destroy the images they have collected . . . Offenders . . . often copy these images to removable media include[ing] . . . cellular phones . . . Similarly, individuals who communicate with children in a sexual manner, online or otherwise, tend to do so with more than one child. I believe that a forensic examination of the red and white Apple iPhone 8 Plus . . . will reveal the instrumentalities and fruits of the crime of PC 311.11([c])(1).

(ECF No. 54-3 at 10.)

Following the issuance of the second warrant, Detective Kalar found nearly 600 images and videos depicting child pornography and child sex abuse with victims ranging in age from 6-months-old to 15-years-old. (ECF No. 1 at 8.) Detective Kalar found the Skout application on Defendant's phone with the user account name "Teachyou559" and "mrteacher559." (*Id*.) Detective Kalar found the Pinger application on Defendant's phone. (*Id*.)

On July 30, 2020, the Fresno County Sheriff's Office executed a state search warrant at Defendant's residence in Clovis, CA, seizing all electronic devices for forensic analysis, and arresting Defendant. (ECF No. 1 at 11.) On August 3, 2020, Clovis Police Department Officer Destin Watkins determined there was no child sexual abuse material located on the devices. (*Id*.) Officer Watkins also reviewed the evidence Detective Kalar previously reviewed and also located child exploitation material on Defendant's cellphone. (*Id*. at 11–12.)

On December 13, 2022, Officer Watkins updated the government on his forensic report. (ECF No. 54-6 at 2.) In an email to the prosecutors on the matter, Officer Watkins stated:

[W]orking on the question of activity occurring just before and after [Defendant's] arrest [, u]sing [11:00pm] as the arrest time, I searched for power activity on the device. In the approximately 15 minutes up to the arrest time, the chart below shows the lock state of the device. Because the times can only be displayed in minutes:seconds there are some instances below where two events that occurred almost at the same time get rounded to the nearest second. [F]or example, the phone was in an unlocked state when the 30 second auto-lock en[g]aged at 10:55:30 PM. The device recorded in a separate artifact as Locked at 10:55:31 PM.

The last Lock state recorded on the device for 7/28/2022 was at 11:00:04 PM (Display Time). You will note that the "Locked" indication was not preceded by an auto-lock. This indicates that physical interaction with the device was required to lock the phone by pressing the power button.

6

1

2

[…]

3      I reviewed the power artifacts for any unlocking events after 11:00:04 PM and noted that
       no unlock events were recorded.  That means that after the device was locked, it remained
4      locked.  Interestingly, between 10:59:00 P and 11:00:04 I can see that the phone was
       displaying notifications from the Pinger app.  I cannot say exactly what was being displayed
5      on the screen of the phone[.]  It is my opinion that the phone was actively displaying Pinger
       notifications prior to being locked at 11:00:04 PM.
6

7      (ECF No. 54-6 at 2–3.)

8                              **MOTION TO SUPPRESS**

9          The Fourth Amendment states, "[t]he right of the people to be secure in their persons,

10     houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S.

11     Const. amend. IV.   In moving to suppress evidence, it is the defendant's burden to establish his

12     standing to do so.  *See Minnesota v. Carter*, 525 U.S. 83, 88 (1990).  To have standing to seek

13     suppression of the fruits of the agent's search, [one] must show that he personally had "a property

14     interest protected by the Fourth Amendment that was interfered with . . . , or a reasonable

15     expectation of privacy that was invaded by the search."  *United States v. Padilla*, 111 F.3d 685,

16     688 (9th Cir. 1997) (quoting *United States v. Padilla*, 508 U.S. 77, 82 (1993)).  The reasonable

17     expectation of privacy turns on (1) whether the person had "an actual (subjective) expectation of

18     privacy," and (2) whether the individual's subjective expectation of privacy is "one that society is

19     prepared to recognize as 'reasonable.'"  *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan,

20     J., concurring).  In short, it turns on whether the individual's subjective expectation of privacy is

21     objectively reasonable."  *United States v. Lopez-Cruz*, 730 F.3d 803, 807 (9th Cir. 2013) (citations

22     omitted).

23         Defendant argues the Court must suppress all evidence, and fruits thereof, obtained through

24     a search of Defendant's iPhone because his initial arrest lacked probable cause and the statement

25     in the supporting affidavit for the search of his iPhone did not afford sufficient probable cause to

26     authorize the resulting search.  (ECF No. 54 at 1.)

27     ///

28

**A. Probable Cause Supported Defendant's Initial Arrest.**

**1. Arguments**

Defendant argues that "[t]he only facts known to the [arresting] officers w[ere] that the unknown person communicating with the undercover [agent] was in a red car." (ECF No. 54 at 5.) Defendant further argues that "he was not at the location where the meeting was to take place. Rather, he was on a public street, lawfully parked, when he was confronted, thrown to the ground, and handcuffed." (*Id.*)

The government argues that the arresting officer, "[Officer] Guzman[,] had ample 'knowledge and reasonably trustworthy information of facts and circumstances' sufficient to lead him to prudently believe that [Defendant] was in the process of committing a crime (attempted sex acts with a minor) just prior to his arrest"; thus, providing probable cause for that arrest. (ECF No. 55 at 9.)  The government argues Officer Guzman's "knowledge" consisted of the following "reasonably trustworthy information":  "(1) SA Jacques' advising the operation team (including the arrest team) that [Defendant] was en route to the park adjacent to the corner of Barcus Avenue and State Street in Fresno in a red vehicle with the intent to engage in illegal sex acts with a 13-year-old girl; (2) SA Jacques continuing to advise the operation team that she had kept contact with [Defendant] through text messages through the time the arrest team advised that they saw the red vehicle [and] the subject arrive at the corner of Barcus and State; (3) [Officer] Guzman being tasked beforehand with preventing any attempts by the subject to destroy evidence prior to apprehension, including his cell phone; (4) [Officer] Guzman's advising [Defendant], as he approached the driver's side of the red vehicle and through multiple verbal commands, to put his hands above his head and not reach for anything in the vehicle; (5) [Defendant] refusing all commands in this regard and instead reaching for his cell phone, which Officer Guzman could see as illuminated at the time (Guzman Declaration at 7); (6) Officer Guzman believing that [Defendant] may have been trying to destroy possible evidence in the cell phone; and (7) [O]fficer Guzman having to forcibly remove [Defendant's] cell phone from [his] grasp.  (ECF No. 55 at 9.)

**2. Legal Standard**

The parties agree Defendant was arrested without a warrant.  (ECF Nos. 54 at 4–5; 55 at 8.)

8

When there is no warrant, an arrest must have probable cause. *See Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011). "Probable cause exists if the arresting officers 'had knowledge and reasonably trustworthy information of facts and circumstances sufficient to lead a prudent person to believe that [the arrestee] had committed or was committing a crime.' [Citations]." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097–98 (9th Cir. 2013) (*Gravelet*). "It is well-settled that 'the determination of probable cause is based upon the totality of the circumstances known to the officers at the time of the search.'" *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 (9th Cir. 2012). The totality of the circumstances includes "the knowledge of the other officers at the scene" that would lead "a prudent person [to] believe the suspect had committed a crime." *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 966 (9th Cir. 2001).

### 3. Discussion

"Under the collective knowledge doctrine, we must determine whether an . . . arrest complied with the Fourth Amendment by 'look[ing] to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually [undertakes the challenged action].'" *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007). "There is no requirement that [the arresting officer] have been connected to or involved in the prior investigation." *Id.* at 1037 n.8. This doctrine applies "where an officer (or team of officers), with direct personal knowledge of all the facts necessary to give rise to reasonable suspicion or probable cause, directs or requests that another officer, not previously involved in the investigation, conduct a stop, search, or arrest." *Id.* at 1033.

The government's restatement of the operative facts employs the "collective knowledge" doctrine. In his Use of Force report, Officer Guzman explicitly states that ICAC investigators requested that MAGEC "assist with the apprehension of a subject who had arranged a meeting with an undercover agent posing as a child." (ECF No. 54-4 at 2.) He was told that the subject of the arrest, Defendant, "was confirmed to be a [sex-offender] registrant with prior convictions for sex crimes against children." (*Id.*) Further, ICAC investigators directed Officer Guzman to the intersection of State Street and Barcus Avenue, where Defendant "had arranged to meet with what

9

he believed to be a juvenile subject." (*Id.*)  ICAC detectives specifically requested Officer Guzman

prevent Defendant from destroying any evidence, including cell phones.  (*Id.*)  In addition, Officer

Guzman "established communication with HSI [a]gents who were "actively conducting

surveillance." (*Id.*)  HSI Agents "direct[ed] MAGEC detectives to [Defendant]'s location once he

arrived." (*Id.*)  "Upon his arrival in the area, Lt. Pursell gave the directive for MAGEC Units to

move in and take [Defendant] into custody." (*Id.*)

The entirety of the arrest, as stated in Officer Guzman's report, demonstrates that Officer

Guzman communicated with officers who had all of the facts necessary to establish probable cause

for the arrest.  ICAC and HSI agents simply directed Officer Guzman to carry out the arrest.  They

communicated the nature of the crime, the arrival time and location of Defendant, and even the

means of evidence to be preserved.  Importantly, ICAC and HSI agents were not acting out of

unsupportable suspicion.  Instead, they acted from SA Jacques' multi-day investigation where

Defendant aggressively pursued lewd and lascivious acts with someone whom he thought to be a

child under the age of 14, sending over 3,000 text messages, showing up near what he thought was

her home, and engaging in a seemingly endless barrage of predatory grooming behaviors.

Defendant argues, tediously, that he was not at the physical location mentioned in this

report.  The facts indicate that Defendant was parked in front of the Community Center parking lot

located at State and Barcus, rather than inside of the parking lot provided for the Community Center

itself.  Unfortunately for Defendant, common sense supports the deduction that he was in fact *at*

the specified location under the circumstances of this case.

Thus, the facts of this case fall squarely in line with the collective knowledge doctrine.  The

government is correct, and the Court finds that Defendant's initial arrest was supported by probable

cause.

**B. The Magistrate Judge Validly Issued the First Search Warrant.**

**1. Arguments**

Defendant argues the affidavits the magistrate relied upon to issue the search warrant

authorizing the government to search Defendant's iPhone were insufficient, and, as a result, the

first search warrant was not validly issued and the fruits resulting from the search must be

10

1    suppressed.[1]

2          First, Defendant argues that "Detective Kalar had no personal knowledge of what was

3    visible on [Defendant]'s cellphone screen.  The only officer who saw [Defendant]'s cellphone at

4    the time of his arrest was [Officer] Guzman. [] [Officer] Guzman makes no mention of seeing any

5    active conversation on the phone screen."  (ECF No. 54 at 5–6.)  Defendant argues "this is

6    consistent with the forensic examination of the phone that showed the screen was manually locked

7    at the time of the stop.  []Although notifications may have been visible prior to 11:00:04 p.m., it

8    remained locked after 11:00:04 p.m." and "in flat contradiction to Detective Kalar's statement that

9    the phone was open to the Pinger application and actively messaging [SA] Jacques at the time

10   [Defendant] was arrested.  No reports that were authored prior to Detective Kalar's affidavit make

11   any mention of the cellphone being open to the Pinger application, a fact which Detective Kalar

12   invented from whole cloth to manufacture probable cause.  The inclusion was not a mere error or

13   negligence; it was a complete fabrication."  (*Id.*)

14         The government argues "[Defendant's] claim . . . fails to acknowledge that Detective Kalar

15   instead attributed [that statement] to SA Jacques, the only agent able to accurately advise everyone

16   that [Defendant] continued to text her as he approached the parties.  The arrest team was not in

17   position to know the extent [Defendant] continued to text SA Jacques as he approached the park,

18   SA Jacques was.  She advised her team members of this fact, and Detective Kalar credited her with

19   this statement within his affidavit."  (ECF No. 55 at 11–12.)

20         Second, Defendant argues "the affidavits fail[ed] to establish a 'fair probability' that

21   evidence of a crime would be found on [Defendant's] phone."  (ECF No. 54 at 6.)  Because,

22   Defendant argues, the "active conversation with the undercover agent" was "clearly material to the

23   magistrate in determining whether the affidavit established probable cause to search the phone,"

24   and because "the statements about the phone screen create the nexus between the phone and the

---

[1] Defendant does not argue the issuing magistrate committed clear error, despite citing case law that acknowledges *that* is the relevant legal standard to invalidate the issuance of a search warrant.  In so doing, Defendant's argument conflates his motion to suppress with his motion to quash, arguing that because Detective Kalar's statements in his affidavit were "reckless" and "knowingly false," the search warrant is invalid as the magistrate relied solely on Detective Kalar's affidavit to issue the warrant.  Thus, the reasoning here also applies to the motion to quash.

offense by connecting Defendant to the VOIP number used to contact the undercover agent," "[w]ithout that information, the only facts in the affidavit linking [Defendant] to the offense are that he was a registered sex offender in the area of the park in a red car," which "does not give rise to a 'fair probability' that evidence of a crime would be found on the cellphone."

The government argues "the Kalar affidavit contains ample additional facts demonstrating the probability that criminal activity was located in [Defendant's] cell phone, which [Defendant] does not separately challenge." (ECF No. 55 at 12.)  Further, the government argues, "[e]ven if the court finds that the information set forth in the Kalar affidavit does not support sufficient probable cause in support of the warrant, Detective Kalar acted in good faith in both seeking it and unearthing evidence in reliance on its viability" under the *Leon* "Good Faith" exception.  (*Id.*, citing *United States v. Leon*, 468 U.S. 897, 926 (1984).)

**2. Legal Standard**

Affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation.  Technical requirements of elaborate specificity once exacted under common law pleading have no proper place in this area." *Illinois v. Gates*, 462 U.S. 213, 235 (1983) (*Gates*). "[W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review.  A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'  [Citation.]  'A grudging or negative attitude by reviewing courts toward warrants,' [citation], is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant 'courts should not invalidate . . . warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner.'" *Id.* at 236.

The issue is whether the issuing magistrate, "had a "'substantial basis for . . . conclud[ing]"' that a search would uncover evidence of wrongdoing." [2] *United States v. Terry*, 911 F.2d 272, 275 (9th Cir. 1990).  A "substantial basis" is "[s]ufficient information . . . to allow that official to determine probable cause"; it must not be "a mere ratification of the bare conclusions of others,"

---

[2] While the parties agree on this standard in their briefs, Defendant also raises the Riley standard in his motion, which considers the unique sensitivity and privacy interest in searching a cell phone.  *See Riley v. California*, 573 U.S. 373, 392–97 (2014).  However, that standard is inapplicable here, as it applies when there is a search incident to arrest, or when there is no issued search warrant.

instead, a "flexible, common-sense standard" to establish the existence of probable cause.  *See*

*Gates*, 462 U.S. at 239.  This common-sense standard captures "[t]he task of the issuing magistrate

. . . to make a practical, common-sense decision whether, given all the circumstances set forth in

the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying

hearsay information, there is a fair probability that . . . evidence of a crime will be found in a

particular place."  *Id*. at 238.

Ultimately, the issuance of a search warrant is reviewed for clear error, and the issuance of

the warrant must be upheld "so long as the court had a 'substantial basis' for concluding probable

cause existed based on the totality of the circumstances."  *United States v. Bertrand*, 926 F.2d 838,

841 (9th Cir. 1991); *see also United States v. Battershell*, 457 F.3d 1048, 1050 (9th Cir. 2006).  A

magistrate commits "clear error" when they fail to rely on that "substantial basis."  *Id.*

### 3. Discussion

The government is correct.  An affidavit can rely on information from a credible source, so

long as the source was trustworthy and obtained the information in a reliable way.  *See United*

*States v. Stanert*, 762 F.2d 775, 779–80 (9th Cir. 1985), amended, 769 F.2d 1410 (9th Cir. 1985)

(*Stanert*) (citing *United States v. Landis*, 726 F.2d 540, 543 (9th Cir. 1984), cert. denied, 467 U.S.

1230, 104 S.Ct. 2688, 81 L.Ed.2d 882 (1984)); *see also People v. Hochanadel*, 176 Cal.App.4th

997, 1018 (2009) (implying the collective knowledge doctrine applies to expert detectives

authoring search warrant affidavits).  The information SA Jacques reported to Detective Kalar was

not a bare conclusion that failed to reveal its basis of knowledge; it was based on an in-depth

investigation led by a professional investigator.  Further, the information from SA Jacques was

extremely specific in naming where the evidence of the crime was—Defendant's phone.

Also, the magistrate was presented with other information which, when combined with the

information from SA Jacques, would have enabled her to conclude there was "a fair probability

that contraband or evidence of crime" would be found in Defendant's phone.  *See Gates*, 462 U.S.

at 238.  For example, Officer Guzman saw Defendant on his phone during the arrest and was

specifically informed by other investigating agents that Defendant may try to destroy evidence

particularly on his phone.  Further, all participating agents were informed that SA Jacques was

1    actively conversing with Defendant through the Pinger application up until the time of

2    Defendant's arrival.  Under the totality of the circumstances, the magistrate could have reasonably

3    drawn the common-sense deduction that Defendant was communicating with the agent on the

4    phone and that the communication was evidence of criminal activity.

5           Moreover, Detective Kalar himself has extensive experience investigating cases involving

6    offenders who attempt to illicit sexual acts from minor children (*see e.g. United States v. Chavez-*

7    *Miranda*, 306 F.3d 973, 978 (9th Cir. 2002) ("issuing judges may rely on the training and

8    experience of affiant police officers")), and reliance on the expertise of the affiant may provide a

9    substantial basis supporting a finding of probable cause.  *See also United States v. Garay*, 938 F.3d

10   1108, 1113 (9th Cir. 2019) ("We have long held that affiants seeking a warrant may state

11   conclusions based on training and experience without having to detail that experience").

12          Finally, Defendant is a registered sex offender and was convicted for lewd acts with minors

13   under the age of 14, and his prior behavior "ma[kes] the charge against [him] much less subject to

14   s[k]epticism."  *Jones v. United States*, 362 U.S. 257, 271 (1960) (overruled on other grounds).

15   "[V]iewed together the 'totality of the circumstances' was sufficient to establish probable cause to

16   believe that evidence of [illegal] activity would be found" on Defendant's phone.  *Stanert*, 762 F.2d

17   at 780.

18      **C. Conclusion**

19          The Court finds that the totality of the circumstances as set forth in the affidavit provided

20   the issuing magistrate with a substantial basis for concluding that probable cause existed to search

21   Defendant's phone; therefore, the magistrate committed no clear error.  As such, the Court does not

22   reach the issue of whether the Good Faith Exception would apply.

23                          **MOTION TO QUASH**

24      **A. Arguments**

25          Defendant argues he is entitled to a *Franks* hearing because of Detective Kalar's

26   "knowingly false statements" regarding whether Defendant's phone was "open to the Pinger app"

27   as articulated in the section above.  (ECF No. 54 at 7.)  Further, Defendant argues "the 'good faith'

28   exception to the exclusionary rule is not available where the affiant misled the magistrate with

1    information he 'knew was false or would have known was false except for his reckless disregard

2    of the truth.'"  (ECF No. 54 at 7; ECF No. 56 at 3.)

3        The government argues that "no evidence suggests that the Kalar affidavit contained

4    omissions, or misstatements."  (ECF No. 55 at 14.)

5    **B.  Legal Standard**

6        The standards applicable to such a challenge brought under *Franks* are well-established and

7    apply where a search warrant is at issue.  Under those standards, "[a] defendant is entitled to an

8    evidentiary hearing if he 'makes a substantial preliminary showing that a false statement knowingly

9    and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant

10   affidavit, and if the allegedly false statement is necessary to the finding of probable cause.'"  *United*

11   *States v. Craighead*, 539 F.3d 1073, 1080–81 (9th Cir. 2008) (*Craighead*) (quoting *Franks v.*

12   *Delaware*, 438 U.S. 154, 155–56 (1978) (*Franks*)); *see e.g. United States v. Flyer*, 633 F.3d 911,

13   916 (9th Cir. 2011); *United States v. Chavez-Miranda*, 306 F.3d 973, 979 (9th Cir. 2002) (A

14   defendant "bears the burden of proof and must make a substantial showing to support both

15   elements")[3]; *United States v. Bennett*, 219 F.3d 1117, 1124 (9th Cir. 2000); *United States v. Johns*,

16   851 F.2d 1131, 1133 (9th Cir. 1988) (*Johns*).

17       Therefore, to be entitled to an evidentiary hearing, a defendant must come forward with

18   specific allegations, allege a deliberate falsehood or reckless disregard for the truth, and support

19   that claim with a sufficient offer of proof.  *Craighead*, 539 F.3d at 1080 (citing *United States v.*

20   *Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983)); *see also Franks*, 438 U.S. at 171 ("To mandate an

21   evidentiary hearing, the challenger's attack must be more than conclusory and must be supported

22   by more than a mere desire to cross examine"); *United States v. Prime*, 363 F.3d 1028, 1031 n.1

23   (9th Cir. 2004) ("In order to receive a *Franks* hearing, the defendant must make a non-conclusory

24   and substantial preliminary showing that the affidavit contained actual falsity [or an omission], and

25   that the falsity either was deliberate or resulted from reckless disregard for the truth")(superseded

26   on other grounds).  Where such a substantial preliminary showing is made, "the court must hold a

27
28
---
[3]  If the defendant fails to make a "substantial preliminary showing" with respect to either intentional or reckless inclusion or omission, or materiality, the district court should not conduct a *Franks* hearing.  *See Shryock*, 342 F.3d at 976–77.

1  hearing to determine if any false statements deliberately or recklessly included in the affidavit were

2  material to the magistrate's finding of probable cause." *Johns*, 851 F.2d at 1133 (9th Cir. 1988)

3  (quoting *United States v. Burnes*, 816 F.2d 1354, 1357 (9th Cir. 1987)); *see also Stanert*, 762 F.2d

4  at 780; *Chavez-Miranda*, 306 F.3d at 979.

5       **C. Discussion**

6       Defendant draws conclusions from facts not on the record—he argues, "[Detective Kalar's]

7  statement that [Defendant's] phone was 'messaging Agent Jacques' in the 'Pinger' application at

8  the time of his arrest was deliberately crafted to lead the magistrate to believe that a law

9  enforcement officer saw messages to or from Agent Jacques open on [Defendant's] phone, thus

10 establishing that he was 'Teachyou559,' a material fact in the magistrate's determination of

11 probable cause." (ECF No. 56 at 3.)  Defendant goes so far as to potentially misconstrue the facts

12 when he states, "Neither Agent Jacques nor [Officer] Guzman corroborate this fact in their

13 declarations." (*Id.*).

14      In fact, the defense admits Officer Guzman saw Defendant's phone illuminated during the

15 arrest and admits that SA Jacques was actively messaging Defendant through his VOIP cell phone

16 during the arrest. (ECF No. 56 at 3–4.)  Yet, perceptibly without any basis, Defendant concludes

17 that Detective Kalar's deduction that Defendant was messaging SA Jacques is "whole cloth to

18 manufacture" and "complete fabrication" recklessly made.

19      Because the Court concludes here and in the section above that Detective Kalar's statements

20 were neither false, nor recklessly made, we do not reach the issue of whether Defendant is entitled

21 to a *Franks* hearing, as Defendant has failed to establish threshold eligibility for a *Franks* hearing.

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

**CONCLUSION**

Accordingly, for the reasons set forth above, the Court DENIES Defendant's motion to suppress, motion to quash, and request for evidentiary hearing (ECF No. 54).


IT IS SO ORDERED.

Dated:   August 30, 2023

_____
UNITED STATES DISTRICT JUDGE

17